BENTON *v.* SOUTHERN ENGINE & BOILER WORKS.

Opinion delivered January 8, 1912.

1. COUNTERCLAIM AND SET-OFF—SEPARATE CONTRACT.—In a suit upon contract by a nonresident against a resident, defendant may in equity set off a claim for unliquidated damages arising out of breach of an independent contract between the parties. (Page 497.)

2. APPEAL AND ERROR—CONCLUSIVENESS OF CHANCELLOR'S FINDING—It is the duty of the Supreme Court to try chancery cases *de novo*, and in doing so the court gives much weight to the finding of the chancellor upon conflicting evidence; and where the testimony is evenly poised or the chancellor's finding is not clearly against the preponderance of the testimony, such finding will not be disturbed. (Page 503.)

Appeal from Monroe Chancery Court; *John M. Elliott*, Chancellor; affirmed.

STATEMENT BY THE COURT.

This is an action in replevin, brought by appellee against appellant, to recover certain machinery, alleging that it was the owner thereof under a contract retaining title until the purchase money was paid. The value of the machinery was alleged to be $600; that there was remaining past due and unpaid of the purchase price $217, with interest, which appel-

lant, after demand, refused to pay. The statutory grounds to maintain replevin are set up, and there was a prayer for possession of the machinery.

The clauses of the contract which appellee set up and under which the appellant purchased the machinery, material to the statement, are as follows:

"WARRANTY:—The Southern Engine and Boiler Works guarantees said machinery and property shall be as represented herein, and of good material and workmanship—to do good work when properly set down and operated. And the party of the second part agrees to test the same within thirty days after received, and if, upon trial, said machinery should not prove as herein represented, the party of the second part expressly agrees to give immediate written notice to the said Southern Engine and Boiler Works, of Jackson, Tennessee, and to allow the company a reasonable length of time, after having received said written notice, to send a man to adjust said machinery, the purchaser agreeing, at the time, to give full co-operation together with necessary help.

"The use of said machinery, without giving the written notice as herein provided, shall be deemed and construed an acceptance of same and conclusive evidence that said property is as herein represented."

A further clause provided that the appellee should retain the legal title to the machinery until payment in full of the purchase money, and, in the event any of the payments were not made at the times specified, the remaining notes should become at once due and collectible, and giving to appellee the right to enter and take possession of the property. There was a clause also reciting "that the writing and printing in this contract contains the full and entire agreement between the parties hereto, and that no verbal agreement is of any force or effect whatever, and in no way to be held binding in connection with this contract."

Appellant answered, and made his answer a cross complaint, in which he denied that appellee was the owner of the property replevied; denied its value; denied that he retained possession under a false claim of ownership; alleged ownership in himself, but admitted owing $200 of the purchase money. He set up, by way of counterclaim, that he purchased from appellee in

October, 1906, a certain steam engine to be used in operating his sawmill and cotton gin; that said purchase was made under a contract, written and printed, by the terms of which appellee guarantied that the engine should be as represented in the contract; that it was of good material and workmanship and would do good work; that the purchase of the engine was made under the above guaranty, and same was delivered to the appellant, he paying therefor the full consideration of $675. Appellant further alleged that the guaranty failed because the engine was not of good material and workmanship; that it was properly set up and properly operated about four months during the years 1906 and 1907, and that "it blew up in the latter part of November, 1907, on account of defective material and defective construction, rust streaks in parts composing the engine and workmanship in the piston and rod, the same not having been made long enough to pass through the hole made for it and to be properly welded or bradded."

Appellant set up that appellee was a foreign corporation, and had no property in the State subject to attachment, and no agent in the State upon whom service of process could be had; that he was without remedy in a court of law, and prayed that the cause be transferred to chancery, and that further proceedings at law be restrained. He prayed in his cross complaint that he be given judgment for $675, with interest and costs, less the amount of conceded indebtedness due appellee.

The appellee answered appellant's cross complaint, denying that the engine sold to appellant in 1906 was of defective material and workmanship, and denied that it has made any false or untrue agreements, contracts or warranties, and denied that it had made any misrepresentations, and set up that the contract under which the engine was sold was in writing, signed by the appellant and appellee, and that it contained an express provision that if anything should be found short, broken, defective or not as specified, notice thereof should be given appellee in writing within ten days after the engine was received by appellant that appellee might have an opportunity to correct such, and that no such notice was given at any time by appellant, although appellant kept and used the engine for a year or more; that the contract required appellant to test the engine within thirty days from the receipt of it, and, if

on such test the engine should not prove as represented in the contract, appellant expressly agreed to give appellee immediate notice in writing, and that, if he should use the engine without giving such written notice, such use should be decreed and construed an acceptance of the engine and conclusive evidence that it was as represented in the contract; that appellant kept and used the engine for more than a year without giving such notice or any notice, and that he was therefore precluded from recovering on the alleged breaches of the contract set up by appellant.

The case was transferred to the chancery court. After hearing the evidence, the court found the issues in favor of appellee, and entered a decree in its favor for the possession of the property, and, in the event the property could not be delivered to appellee, judgment in its favor in the sum of $272.70, and dismissed appellant's counterclaim for the reason that it "was not sustained by sufficient proof." Appellant duly prosecutes this appeal.

There was a demurrer to the answer and cross complaint of appellant filed by the appellee, setting up that same did not constitute a defense to plaintiff's action, nor a legal setoff or counterclaim against appellee's cause of action, but this demurrer was never passed upon by the court, and the appellee filed an answer to the cross complaint, and the cause was transferred to chancery without objection on the part of appellee, and proceeded to a hearing there upon the issues as made by the pleadings. We shall therefore treat the case as properly transferred to the chancery court.

*Manning & Emerson,* for appellant.

The court was fully authorized to consider the cross complaint and to award damages thereon. The evidence is undisputed that there was an express warranty. It shows also that there was a breach of the warranty and that appellant was damaged thereby. It follows therefore that he should recover the damages from his warrantor. 92 Ark. 594; 35 Cyc. 366; 125 Mo. 703, 103 S. W. 112; 19 R. I. 356, 33 Atl. 875; 22 Ark. 454; 35 Cyc. 378 and cases cited; 92 Ark. 310.

*E. H. Mathes* and *E. L. Westbrook,* for appellee.

There is no similarity between the case at bar and the case

relied on by appellant, 92 Ark. 594; no similarity in the contracts sued on.

The agreement was in writing, and was executed under circumstances excluding the idea, ignorance of its contents or lack of opportunity to know what it contained, and there is no charge of fraud or overreaching. Appellant is bound by it. 70 Ark. 572; 71 Ark. 185. It can not be varied or added to by parol evidence. 75 Ark. 206; 78 Ark. 574; 98 Ark. 482.

Appellant was bound to give notice in the time and way provided for in the contract, and, not having done so, must be held to have waived the warranty, 98 Ark. 482.

WOOD, J., (after stating the facts). Under the pleadings and the undisputed evidence the appellee should be allowed to recover unless the appellant's answer and cross complaint present a good cause of action against the appellee, according to the doctrine announced in *Ewing-Merkel Elec. Co.* v. *Lewisville Light & W. Co.*, 92 Ark. 594. In that case we held that (quoting syllabus): "In a suit upon contract by a nonresident against a resident of this State, the defendant will be allowed in equity to set-off a claim for unliquidated damages growing out of the breach of an independent contract between the same parties."

The questions presented by the cross complaint and the answer are:

1. Whether or not there was a breach of the warranty in the contract under which appellant purchased the engine of appellee in 1906. The contract under which that engine was purchased expressly warranted that the engine "shall be as represented herein and of good material and workmanship— to do good work when properly set down and operated." As to whether or not this warranty was breached by the appellee was purely a question of fact.

There were three witnesses on behalf of the appellee. One of them, the general manager for ten years, testified that they manufactured a thousand engines a year; that he had been a manufacturer of engines for more than 18 years, and understood the proper construction of engines. He said that the engine in controversy was manufactured in appellee's plant, was placed on the testing block in the factory and operated several hours

and tested thoroughly to see that everything about it was correct. The engine left the plant in first-class condition.

Another witness, the general superintendent, had been with the company eight years. He had been designing and building stationary engines for twelve years, and was familiar with the details of the manufacture of steam engines. Had been connected with some of the best known engine mills in the United States; had superintended the building of thousands of engines, and had made a close study of the causes of accidents to engines.

The other remaining witness had been vice president and sales manager of appellee for thirteen years. He had been in the manufacturing of steam engines fourteen years, and had had close observation of them for a much longer time, and was fully acquainted with the type of engine in question. He knew the engine that appellant purchased; it was manufactured in the best way, fitted up in all parts with ample strength for an engine of its size. The piston head was made in accordance with the best plans, the piston rod being forced into the piston head by hydrostatic pressure of between five and eight tons, and was then beaded over at the end to more effectively hold the head on the rod. This was of the best type of cylinder rings and piston head, and made in accordance with the best methods of building steam engines. The engine was first-class in every particular, without any defects or weak points.

One of the witnesses, after describing minutely how the piston and rod were constructed, said: "All piston rods are constructed in this way. The extended or conical edges at end of rod being so constructed to fill up the counter bore of piston more fully. An examination of the rod in question will show where the riveted edges of rod were sheared off, and will also show that rod was galled or scarred, indicating that an enormous pressure of not less than thirty tons were exerted on this rod." He further said that pistons that worked loose never wrecked an engine. "When they get loose, they simply strike the rear head, and always give warning, the engineer having ample time to turn off steam before any damage is done."

These witnesses all substantially agreed as to what might be the cause of the wrecking of an engine of the kind under consideration. They showed that the piston head and piston rod

which appellant shipped appellee in 1908, after the wreck of same, were received at appellee's plant January 22, 1908. They described and explained the reason for the wrecking of the engine substantially as follows;

"The broken piston head and piston rod indicate clearly that something was allowed to get in the cylinder which knocked the piston head loose from the piston rod. It shows that it was struck by a heavy blow, a piece being broken off of the side next to the engine bed. It shows that water or some foreign substance was allowed to get in the cylinder between the piston head and the bed plate of the engine, and that this caused the wreck."

Sketches were exhibited showing how the piston rod and head were constructed. The witness showed that, after an examination of the piston head and rod in question, they were properly put together; that it was originally put on very tight, and it took an enormous power to separate the head from the rod; that the rod projected through the piston head fully three sixteenths of an inch for riveting over the end.

One witness stated that: "The old piston head and rod which Mr Benton sent in, and which was exhibited, showed conclusively for themselves that they were properly manufactured and put together in accordance with the best customs known to mechanical engineers in the United States." The testimony of this witness as to why an engine of the kind under consideration should be wrecked was substantially as follows: "The engineer does not take proper care in making the necessary adjustments. An engine will not take care of itself always; without some competent man to adjust the parts. If the engineer should allow the nut on the rod bolt to work off and let this rod bolt get out, that would cause a wreck just like this one. Should he allow the governor belt to break and run off, should he start the engine and turn on full steam before all the condensation and water is turned out of the cylinder; if the boiler was not properly set and the water could syphon into the cylinder; or should the steam pipe be taken apart to make repairs and a small bolt or nut get inside the steam pipe and work into the cylinder of the engine; if the nut fastened to the piston rod and cross-head be allowed to work loose and allow the rod and cross-head to become separated; should a wrench

fall on the cross-head while in operation; or a nut or bolt fall from above and lodge between the cross-head and cylinder— any of these things would cause the engine to wreck itself."

It was shown on behalf of appellee that appellant sold the engine after it was wrecked to one H. W. Moody, and that he ordered from appellee a list of parts necessary to repair the engine. That included in the list of repairs were a strap and two rod bolts for the wrist of the engine, and the general manager of appellee testified "that the very fact that these parts had to be renewed, and also the stuffing box for the piston had to be renewed, indicates clearly to my mind that the engineer neglected his duty and allowed this engine to come uncoupled and wreck itself. Such a wreck is inevitable where the engineer does not look after the engine and keep the nuts tightened up."

The appellant, in his own behalf, testified that the engine was properly set up and operated by himself or some one on his premises; that he commenced to run it about the first of November, 1906, ran it about two months that season, then commenced to run it again about the first of October, 1907, and ran it until the 20th of November, 1907, when it was wrecked. It was used for ginning cotton and running a sawmill. He testified that they were running with 80 pounds of steam, and that all at once the engine tore up and came to pieces, and the parts of the engine were scattered all around over the engine bed. He identified the parts of the engine which were broken, and said that the pieces showed that in the milling they had not been run together as they should have been to make them solid; that the difficulty was in the molding and the material of which they were made. He said in the broken parts he found rust streaks and found rust streaks all through the casting, as if it had been made of scrap iron, and that these flaws were caused by using old rusty iron in making the casting. He testified further that the piston was not properly fastened into the piston rod; that it should have gone far enough through to have been swollen on the head, but only came through the sixteenth of an inch; that the entire engine was made of a kind of soft material. He said that he had been operating a gin with engines for ten or fifteen years; that the life of an engine, such as this one was represented to be, when properly handled, was fifteen or

twenty years.   He said that during the time he operated it it was properly managed and operated.   He said it was protected from the weather; that the roof leaked a little but not enough to damage the engine in any way; that it was damp in all engine rooms.   He said that he notified appellee of the explosion by telephone about ten minutes after the wreck happened. He further said that the engine operated very well, but not entirely satisfactory, during the first thirty days, but that he thought as soon as it adjusted itself it would be all right.   He could not detect the defects mentioned until after the engine exploded.   He further said that the piston and rod, in his judgment, were not fastened as they should have been.   He said that the new piston rod and head that were used in repairing the engine after it had blown up were not properly fitted in the head; that the defect could not be discovered, however, until after it is used; that the defect in the second piston rod and head showed up within thirty days after the rod was used in the engine, but did not show up in that time in the first one, which came with the engine.

Other witnesses on behalf of appellant corroborated his testimony as to the defects in the engine and the construction of the piston rod and head.   One witness, a farmer and engineer, said that there were defects in the casting which was broken; that he worked there the summer before the engine blowed up, and that the valve slipped three or four times while they were sawing.   He said he was not an expert machinist, but had worked with engines ever since he could remember, and he was then 43 years of age.   He said that he was on the ground the day the engine wrecked, after it had blown up, and that it was torn all to pieces.

Another witness said that he had had 20 years' experience in handling steam engines, and was at the appellant's gin when the engine in question blew up.   After describing the broken parts, as they appeared to him after the wreck, he says: "The piston rod was not made long enough to go through the piston and brad or swell, and the molding of the main body seemed to have run too cold and didn't stick."   He measured the rod that went through the piston; it was not more than a sixteenth of an inch longer than the hole made for it through the piston; it should have been half an inch longer.   There were rust streaks

all through the main body of the engine. The engine was not made of good material and by good workmanship. It had been properly set up and operated. He said that he was working for appellant on a salary, but had no interest in the engine, mill or gin.''

Another witness testified that he had built and repaired engines, but never ran one. He examined and repaired the last piston rod sent appellant for the engine that was damaged. The bore and piston head were too large for the piston rod; it didn't fit; it should have been a shrunk or pressed fit, which was easily driven back to position and re-riveted. He didn't see the first piston rod. If it had been inserted in the head, as it should have been, there would not have been any accident, such as occurred. The accident was caused entirely by the bad workmanship, or due to the carelessness of the fit. He was not a practical moulder, but was a practical machinist; had been in a machine shop for about 35 years, and had never followed any other occupation. The piston rod and piston head sent to repair the wrecked engine needed repairing before they could be used, and he repaired them. The rod and head had the appearance of being new, and he would say that it was, but didn't know of his personal knowledge; didn't have the appearance of having been worked on before it came to his shop.

Still another witness testified that he had operated engines for the past twelve years, and operated the engine in question after it had been repaired from the wreck. He went into it, and found the piston head was about to come off the rod, and if he had not stopped the engine when he did, in two or three more revolutions the head would have come off and the engine torn up again. The defect was that the head was not properly fitted on the rod. He had examined the piston rod which was in the engine when it was wrecked, and the piston rod sent to replace the old one pulled loose just as the old one had done. That is, it had pulled back in the piston head about an inch, and if he had not stopped the engine just when he did there would have been a wreck like they had before. The piston rods were both in the same condition. He was not a moulder or machinist, but understood steam machinery from practical experience. He was a practical engineer. Said that he knew the piston

rod sent to repair the old one would have to be taken out of the head and the head counter-sunk more than it was in order that the piston rod might be long enough to upset to make it hold, as the rod was too short to hold it in the shape it was.

It will be observed from the above testimony that there is a decided conflict in the evidence as to whether or not the engine was of good material and of good workmanship, as required under the warranty contained in the contract of purchase. It is difficult to determine which of the parties had the preponderance in his favor, but we are of the opinion that the finding of the chancellor is, to say the least, not clearly against the weight of the evidence. We are of the opinion that if there had been such marked defects in the material of which the engine was constructed and in the workmanship as the testimony on behalf of appellant tends to show there were, such defects would have manifested themselves long before the wreck occurred, and, in our opinion, the preponderance of the evidence tends to show that there were no defects, either in the material of which the engine was constructed or in the workmanship by which it was constructed. It seems to us that those who constructed the engine, and who show themselves to be experts along that line, are best qualified to speak with reference to the material and workmanship that entered into the make-up of the engine; and if their testimony is true, certainly there was no breach of warranty in this case.

The chancellor has determined that the preponderance of the evidence on this question was in favor of the appellee, and we are of the opinion that his judgment should be, in a case like this, strongly persuasive. As we said in *Greenlee* v. *Rowland*, 85 Ark. 105: "It is the duty of this court to try chancery cases *de novo*, and in doing so the court gives much weight to the finding of the chancellor upon conflicting evidence; and where the testimony is evenly poised, or nearly so, the finding of the chancellor is accepted as conclusive."

It is the well settled rule of this court that the finding of a chancellor on questions of fact will not be disturbed unless they are clearly against the preponderance of the evidence. *Leonard* v. *Leonard*, *post* p. 522, and cases there cited.

2. Since we have concluded that there was no breach of the warranty, as found by the chancellor, it becomes unnecessary

to inquire whether or not appellant had complied with the conditions of the contract as to notice.

The judgment is affirmed.